UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

In re Application of

MOTRANSA S.A.,

      Applicant

pursuant to 28 U.S.C. § 1782
For Judicial Assistance in Obtaining
Evidence for Use in Foreign and International
Proceedings.

## APPLICATION OF MOTRANSA S.A. FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

Motransa S.A. ("Motransa" or "Applicant") respectfully submits this Application for Judicial Assistance pursuant to 28 U.S.C. § 1782 in obtaining documentary and testimonial evidence for use in a contemplated foreign proceeding (the "Application"). In support of its Application, Motransa respectfully states as follows:

## INTRODUCTION & RELEVANT FACTS

1.    The facts relevant to this Application are set forth below and in the Declaration of Eduardo Carmigniani (the "Declaration"), attached as **Exhibit "A"**. The facts stated in the Declaration are incorporated herein by reference.

2.    Applicant seeks assistance from the United States District Court for the Southern District of Florida to obtain documentary and testimonial evidence from Navistar, Inc. ("Navistar" or "Discovery Target") that will be used in a contemplated civil action before the Judicial Unit of Commercial Disputes of Quito (Unidad Judicial Civil de Quito) (the "Ecuadorian Court") to support a

claim by Applicant against Navistar's recently-appointed truck distributor in Ecuador, Austral Cia. Ltda. ("Austral"), for tortious interference[1] (the "Contemplated Proceeding"). *See* Exh. A, at ¶ 16-17.

3.    Navistar is a corporation organized under the laws of Delaware that also transacts business and resides or is found in this District from its office located at 8600 NW 36th Street, Suite 304, Miami, FL 33166. *Id.*, at ¶ 4.

4.    Applicant is an Ecuadorian licensed truck distributor. *Id.*, at ¶ 5. For several decades, Applicant has been the exclusive dealer of Navistar's International brand trucks in the country of Ecuador. *Id.* That long-standing relationship was formalized pursuant to a Distributor Sales and Service Agreement between Morisaenz S.A.C. (Motransa's predecessor in interest) and Navistar International Export Corporation (Navistar's predecessor in interest), dated November 1, 1999, which sets forth Motransa's existing, exclusive, rights for the distribution of International brand trucks in the Ecuadorian territory. *Id.*, at ¶ 6.

5.    The Distributor Sales and Service Agreement, was subsequently modified by a document titled Amendment to Truck Distributor Sales & Service Agreement dated December 15, 2011, between Navistar Global Operations Corporation (formerly, Navistar International Export Corporation) and Motransa (the "Amendment"). *Id.*, at ¶ 7. The Distributor Sales and Service Agreement, as modified by the Amendment, is hereinafter referred to as the "Distributor Agreement." *Id.*

6.    About three years ago, Navistar granted Austral the right to distribute International brand buses to different agencies of the Ecuadorian government. *Id.*, at ¶ 8. During this time, Applicant also supplied International brand trucks to certain public agencies of the Ecuadorian government. *Id.*

---

[1] A claim for tortious interference is known as a disloyal competition action under Ecuadorian law.

2

7.      During 2018, Austral approached representatives of Applicant to distribute International brand trucks to Ecuadorian government agencies.  Applicant declined these overtures by Austral.  *Id.*, at ¶ 9.

8.      In January 2019, two representatives from Navistar's Miami office visited Motransa in Quito to review Motransa's ongoing relationship with Navistar and Motransa's business plan. *Id.*, at ¶ 10.  During a meeting with Motransa and a representative from Austral held on January 15, 2019, Navistar's representatives solicited Motransa to enter into a cooperation agreement with Austral, whereby Austral would work as a "sub-dealer" of Motransa to distribute International brand trucks to entities in the Ecuadorean public sector.  *Id.*

9.      This request was later memorialized unilaterally in a Memorandum of Understanding (the "MOU") transmitted to Motransa on February 14, 2019, by a Navistar employee located in Navistar's Miami office.  *Id.*  The MOU directed Motransa to coordinate with Austral to facilitate Austral's sale of International brand trucks to Ecuadorian public entities in the construction sector and other public-sector tenders to give priority to Austral's business sales. *Id.*  The request in the MOU was in violation of the exclusivity rights given to Applicant under the Distributor Agreement. *Id.*

10.      On August 23, 2019, a Miami-based Navistar representative notified Motransa that Navistar designated Austral as a "full truck distributor" of International brand trucks in the Ecuadorian territory in addition to Motransa—in breach of the Distributor Agreement.  *Id.*, at ¶ 13. The "full truck distributor" distribution rights granted to Austral were much broader in scope than the "sub-dealer" status and rights that Navistar sought to grant Austral under the MOU.  *Id.*

11.      Based on the above, Applicant is actively preparing to file the Contemplated Action against Austral and is poised to commence the Contemplated Proceeding upon receipt of the discovery sought by this Application. *Id.*, at ¶ 14.

12.     Applicant seeks discovery from Navistar to obtain documents, information and testimony related and relevant to the actions taken by Austral to obtain distribution rights from Navistar for International brand trucks in Ecuador, in violation of the exclusive distributorship granted to Applicant under the current Distributor Agreement.  The discovery sought includes documents and testimony regarding communications between Navistar and Austral, internal communications of Navistar related to Motransa and/or Austral in the possession or control of Navistar, and any contracts and/or agreements related to the distribution of International brand trucks between Navistar and Austral, from before and around the time Navistar granted distribution rights to Austral.

13.     Should the Court grant the Application, Applicant proposes to serve Navistar with a subpoena in a form substantially similar to that attached hereto as **Exhibit "B"**.

14.     As detailed below, Applicant meets the statutory requirements under 28 U.S.C. § 1782, and the discretionary factors discussed in the relevant case law weigh in favor of granting the narrowly-tailored relief requested in this Application.

## ARGUMENT

### I.     Standard for Granting Relief

"Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).  Section 1782 "provide[s] for assistance in obtaining documentary and other tangible evidence as well as testimony." *Id.* at 248.  The statute reads, in pertinent part:

> (a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or

4

international tribunal or upon the application of any interested
person and may direct that the testimony or statement be given, or
the document or other thing be produced, before a person appointed
by the court.  By virtue of his appointment, the person appointed has
power to administer any necessary oath and take the testimony or
statement.  The order may prescribe the practice and procedure,
which may be in whole or part the practice and procedure of the
foreign country or the international tribunal, for taking the testimony
or statement or producing the document or other thing.  To the extent
that the order does not prescribe otherwise, the testimony or
statement shall be taken, and the document or other thing produced,
in accordance with the Federal Rules of Civil Procedure.  A person
may not be compelled to give his testimony or statement or to
produce a document or other thing in violation of any legally
applicable privilege.

28 U.S.C. § 1782(a) (2016).

Courts have distilled § 1782's language into a two-part inquiry – whether a district court is *authorized* to grant relief and whether it *should* grant relief in its broad discretion.  A district court is *authorized* to grant relief when the following statutory requirements are met: (1) the person from whom discovery is sought must reside or be found in the district in which the application is filed; (2) the request must seek evidence, whether it be the "testimony or statement" of a person or the production of "a document or other thing;"; (3) the request must be made "by a foreign or international tribunal," or by "any interested person;" and (4) the evidence must be "for use in a proceeding in a foreign or international tribunal."[2]  28 U.S.C. § 1782(a); *see In re Clerici*, 481 F.3d 1324 (11th Cir. 2007).

---

[2] It should be noted that district courts may, and indeed typically do, grant § 1782 relief on an *ex parte* basis.  *See Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*. The respondent's due process rights are not violated because he can later challenge any discovery request by moving to quash [a subpoena] pursuant to Federal Rule of Civil Procedure 45(c)(3).") (citing, *inter alia*, *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 78 (2d Cir. 2012); *In re Clerici*, 481 F.3d 1324 (11th Cir. 2007) (affirming denial of motion to vacate order granting *ex parte* § 1782 application)); *In re Eurasian Bank Joint Stock Co.,* No. 3:15-mc-106-L-

5

Once the district court has determined that it is authorized to grant relief, it is free to grant

relief in its broad discretion.  The court's discretion is guided by the discretionary factors set forth

by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, as follows:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," because "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach" and therefore their evidence may be "unobtainable absent § 1782(a) aid";

> (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";

> (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and

> (4) whether the § 1782(a) request is "unduly intrusive or burdensome."

542 U.S. at 264-65.  This discretion is further informed by the twin Congressional aims of

section 1782, "which are to provide efficient means of assistance to participants in international

litigation in our federal courts and to encourage foreign countries by example to provide similar

means of assistance to our courts."  *In re Pimenta*, 942 F. Supp. 2d 1282, 1289 (S.D. Fla. 2013)

(citing *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24 (2d Cir. 1998)).

As demonstrated below, Applicant satisfies the statutory and discretionary requirements

and, therefore, this Court should grant the relief sought in the Application.

---

BN, 2015 WL 6438256, *2 (N.D. Tex. October 21, 2015) ("the Court notes that *ex parte* filing of an application for discovery under 28 U.S.C. § 1782 is permissible.").

II.    **Applicant Meets the Mandatory Requirements for Granting Relief**

    A.    **The Discovery Target Resides or Is Found in This District**

There should not be any debate that Navistar "resides or is found in" the Southern District of Florida.  Courts in this District have held that a company "resides or is found in" this District if it regularly transacts business in this District or if it may otherwise be served with a subpoena in this District. *See Application of Consorcio Ecuatoriano de Telecomunicaciones S.A.*, 747 F.3d 1262, 1269 (11th Cir. 2014) ("JAS USA…has an office and does business in Miami and is therefore 'found in the district of the district court ruling on the application for assistance'— namely, the Southern District of Florida."); *see also, In re Edelman*, 295 F. 3d 171, 180 (2d Cir. 2002) ("we hold that if a person is served with a subpoena while physically present in the district… then for purposes of § 1782(a), he is 'found' in that district."); *In re Application of MTS Bank*, 2017 WL 3276879, at *5 (S.D. Fla. Aug. 1, 2017) (applying *In re Edelman* in its analysis of whether a 1782 applicant was "found" within this district); *In re Application of Inversiones y Gasolinera Petroleos Valenzuela, S. de R.L.*, 2011 WL 181311 (S.D. Fla. Jan. 19, 2011) (same).

Navistar meets both standards, as it regularly transacts business out of its office at located at 8600 NW 36th Street, Suite 304, Miami, FL  33166, and may otherwise be served with a subpoena in that office. Indeed, agents or representatives from Navistar's Miami office were involved in negotiations with Applicant and Austral at all relevant times, prepared and delivered the MOU, and named Austral as a second distributor of International brand trucks in Ecuador.  Furthermore, Navistar's presence in this District may safely be categorized as systematic and continuous as

evidenced by Applicant's own long history of transacting business with Navistar in Miami.[3] *See* Ex. A, ¶¶ 5-9.

**B.     The Discovery Sought is "For Use" in a Proceeding in a Foreign Tribunal**

Likewise, Applicant satisfies the second and fourth requirements as the Application seeks documents and testimony from Navistar for use in the Contemplated Proceeding before the Ecuadorian Court, and is poised to commence such Contemplated Proceeding upon receipt of discovery sought by this Application. *See* Ex. A, ¶ 14.

It is well settled that a § 1782 application may seek evidence for use in a proceeding that has not yet begun, but that is within reasonable contemplation. *Intel*, 542 U.S. at 258–59. To wit, the Supreme Court in *Intel* noted, "[s]ection 1782(a) does not limit the provision of judicial assistance to 'pending' adjudicative proceedings. In 1964 … Congress also deleted the requirement that a proceeding be 'pending.' When Congress acts to amend a statute we presume it intends its amendment to have a ***real and substantial effect***." *Id.* (internal citations omitted) (emphasis added). *See also Application of Consorcio Ecuatoriano de Telecomunicaciones S.A.*, 747 F.3d at 1269 ("We agree that these contemplated proceedings satisfy section 1782."); *In re Clerici*, 481 F. 3d at 1333 ("the Supreme Court has recognized the broad range of discovery authorized under § 1782 and has held that § 1782 is not limited to proceedings that are pending or imminent") (internal citations ommited).

---

[3] Professor Hans Smit, drafter of § 1782, has commented: "Insofar as the term ["found"] applies to legal rather than natural persons, it may safely be regarded as referring to judicial precedents that equate systematic and continuous local activities with presence." Hans Smit, *American Assistance to Litigation in Foreign and Int'l Tribunals: Section 1782 of Title 28 of the U.S.C. Revisited*, 25 Syracuse J. Int'l L. & Com. 1, 10 (Spring 1998); *see also In re Godfrey*, 526 F. Supp. 2d 417, 422 (S.D.N.Y. 2007) (applying same rationale).

The Contemplated Proceeding satisfies these requirements. Applicant has retained counsel in Ecuador, where the Contemplated Proceeding will be filed before the Ecuadorian Court. *See* Ex. A, ¶ 2. Further, considerable time and effort has been expended in investigating the facts and circumstances to support the Contemplated Proceeding, in reviewing available documentation related thereto, and in gathering evidence at hand. *Id.* ¶¶ 10-13; 17-18. Applicant intends to use the testimony and documents obtained from Navistar through this Application at the outset of the Contemplated Proceeding, as Ecuadorian law requires that the plaintiff in an action—such as the Contemplated Action—present all the evidence it could have obtained at the outset of the action. Thus, Applicant's reasonably Contemplated Proceeding and the discovery sought herein satisfies the second and fourth mandatory requirements of § 1782(a).

## C.   The Applicant is an Interested Person

A person who has "participation rights" and "possesses a reasonable interest in obtaining judicial assistance… qualifies as an interested person within any fair construction of that term." *Intel*, 542 U.S. at 256–57 (internal citations omitted).  "The legislative history to §  1782 makes plain that 'interested person' includes a party to the foreign litigation."  *See Lancaster Factoring Co. Ltd. v. Mangone*, 90 F.3d 38, 42 (2d Cir. 1996) (internal citations omitted). Here, Applicant is an "interested person" as it is the putative claimant or plaintiff in the Contemplated Proceeding. Indeed, Applicant suffered damages as a result of the breach of the Distributor Agreement that was caused by Austral. Accordingly, Applicant possesses a reasonable interest in obtaining judicial assistance from this Court.

Consequently, Applicant meets the third statutory requirement under 28 U.S.C. § 1782(a).

### III.     The *Intel* Discretionary Factors Weigh in Favor of Granting Relief

As noted above, once the District Court has determined that the mandatory requirements for relief under § 1782 are met, the Court is free to grant discovery in its discretion.  As set forth below, the Court should grant the Application as the discretionary factors set forth in *Intel* also weigh in favor of granting the Application.

First, there is no expectation that Navistar will be a party to the Contemplated Proceeding against Austral. *See* Ex. A, at ¶ 15.  The Contemplated Proceeding sets forth a claim of tortious intereference against Austral, and requires a showing that Austral interfered with Applicant's enforceable contract with Navistar that granted Applicant exclusive rights to sell International brand trucks in the territory of Ecuador. *Id.*, at ¶ 17. The claim does not require litigation against Navistar, the counterparty to the contract.  Accordingly, this factor weighs in favor of granting the Application.  *See Intel*, 542 U.S. at 264 ("the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.").

Second, Ecuadorian counsel retained by Applicant to assist in respect to the Contemplated Proceeding has advised that there is no indication that the Ecuadorian Court would not be receptive to the documentary and testimonial evidence sought through the instant Application.  *See* Ex. A, at ¶ 23; *see also In re Eurasian Bank Joint Stock Co.*, No. 3:15-mc-106-L-BN, 2015 WL 6438256, *3 (N.D. Tex. October 21, 2015) ("In the absence of authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782, which Eurasian's local counsel has represented to the Court that he has been unable to find, the Court determines that the second factor does not weigh against an exercise of discretion in Eurasian's favor.").

Third, Applicant's Ecuadorian counsel has advised that the evidence sought through the instant Application would likely be admissible in the contemplated foreign proceedings and does

SEQUOR LAW, P.A.

not otherwise circumvent any proof-gathering restrictions under Ecuadorian law. *See* Declaration, Ex. A, at ¶ 23.

Finally, this Application is not unduly intrusive or burdensome as Applicant proposes to serve Navistar with a subpoena substantially in the form attached as **Exhibit "B"** for this Court's review. Further, Applicant seeks from Navistar documentary and testimonial business information that is or should be readily available to businesses like Navistar that engage in an ongoing business relationship with Austral. Importantly, Applicant is also limiting the relevant period of inquiry from 2014 to 2019. *See* Sample Subpoena, Ex. B.

Thus, each discretionary factor identified by the *Intel* Court weighs in favor of granting the Application.

WHEREFORE, Applicant respectfully request this Court enter an Order, in the proposed or substantially similar form as the form attached hereto as **Exhibit "C"**:

    (a)    confirming that the statutory requirements have been satisfied and exercising its discretion, pursuant to 28 U.S.C. § 1782, and granting this Application for Judicial Assistance;

    (b)    granting Applicant leave to conduct discovery pursuant to the Federal Rules of Civil Procedure, including, but not limited to, leave to serve the Discovery Target with the subpoena, in substantially the same form as the sample subpoena attached as Exhibit B to this Application;

    (c)    reserving jurisdiction to grant Applicant leave to serve follow-up subpoenas on the Discovery Target or any other person or entity as may be necessary to obtain the evidence described in the Application; and

(e)     granting any other relief this Court deems just and proper.


Date: December 6, 2019.

Respectfully submitted,

SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, FL 33131
Telephone: 305-372-8282
Facsimile: 305-372-8202
E-Mail:  alacayo@sequorlaw.com
              jmendoza@sequorlaw.com


By:     /s/ Juan J. Mendoza
        Arnoldo B. Lacayo
        Florida Bar No.: 675482
        Juan J. Mendoza
        Florida Bar No. 113587

*EXHIBIT "A"*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

In re Application of

MOTRANSA S.A.,

Applicant

pursuant to 28 U.S.C. § 1782
For Judicial Assistance in Obtaining
Evidence For Use in Foreign and International
Proceedings.

## DECLARATION OF EDUARDO CARMIGNIANI IN SUPPORT OF
## APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

I, the undersigned, Eduardo Carmigniani, under oath and penalty of perjury, pursuant to 28

U.S.C. § 1746, and duly authorized, declare the following:

1.     I am over the age of 18 and, except otherwise noted, provide this Declaration based on

my own personal knowledge.

2.     I am a partner with the law firm of Carmigniani Perez Abogados, located at Av. 9 de

Octubre 100. Of. 2202. Edif. La Previsora, Guayaquil, Ecuador. I have been retained by Motransa S.A.

("Motransa" or the "Applicant"), to represent it in connection with a Contemplated Proceeding (as

defined below) before the Judicial Unit of Commercial Disputes of Quito  (Unidad Judicial Civil de

Quito) (the "Ecuadorian Court"). I submit this Declaration in support of Motransa's Application for an

Order, pursuant to 28 U.S.C. § 1782, for leave to serve the Discovery Target (as defined below) with a

discovery subpoena in connection with a contemplated action before an international tribunal.

3.     I can read and write English and make this Declaration without the aid of a translator.

As English is not my native spoken language, if called upon, I could testify to all matters set forth in

this Declaration with the aid of a translator.

4.      Applicant seeks assistance from the United States District Court for the Southern District of Florida to obtain documentary and testimonial evidence from Navistar, Inc. ("Navistar" or "Discovery Target").  Navistar is a corporation organized under the laws of Delaware that also transacts business and resides or is found in Miami, Florida from its office located at 8600 NW 36th Street, Suite 304, Miami, FL 33166.  Specifically, Applicant seeks evidence relevant to its claim for disloyal competition and tortious interference against Austral Cia. Ltda.[1] ("Austral"), a recently-appointed Navistar distributor located in Ecuador, as further described below.

### Factual Background Underlying the Contemplated Proceeding

5.      Applicant is an Ecuadorian licensed truck distributor. For several decades, Applicant has been the exclusive dealer of International brand trucks in the country of Ecuador. Applicant is the putative plaintiff in a contemplated foreign proceeding to be filed in Ecuador.

6.      Pursuant to a Distributor Sales and Service Agreement between Morisaenz S.A.C. (Motransa's predecessor in interest)[2] and Navistar International Export Corporation (Navistar's predecessor in interest), dated November 1, 1999, Navistar International Export Corporation formalized a long-standing and ongoing relationship with Motransa, documenting Motransa's existing, exclusive, rights for the distribution of International brand trucks in the Ecuadorian territory.  The Distributor Sales and Service Agreement is attached hereto as **Exhibit 1**.

7.      The Distributor Sales and Service Agreement was renewed for additional terms and was subsequently modified by a document titled Amendment to Truck Distributor Sales & Service Agreement dated December 15, 2011, between Navistar Global Operations Corporation (formerly, Navistar International Export Corporation) and Motransa (the "Amendment"). The Amendment is attached hereto as **Exhibit 2**.  The Distributor Sales and Service Agreement, as modified by the Amendment, is hereinafter referred to as the "Distributor Agreement."

---

[1] Austral is an Ecuadorian corporation with a principal address in Cuenca, Ecuador.

[2] Morisaenz S.A.C. merged with Motransa in 2000.

8.      About three years ago, Navistar granted Austral the right to distribute International brand buses to different agencies of the Ecuadorian government.  During this period, Motransa distributed International brand trucks to other public agencies such as the municipality of Guayaquil and its fire department.

9.      During 2018, Austral approached Motransa representatives to discuss the possibility of distributing International brand trucks to government agencies.  Motransa declined Austral's overture and business proposition.

10.      In January 2019, two representatives from Navistar's Miami office—Manuel Barrios, Regional Vice President of Latin America and Caribbean, and Federico Palomo, Vice President of Global Export—visited Motransa in Quito to review Motransa's ongoing relationship with Navistar and Motransa's business plan.  During a meeting with Motransa held on January 15, 2019, and attended by Mr. Barrios, Mr. Palomo, and a representative from Austral, Navistar's representatives solicited Motransa to enter into a cooperation agreement with Austral, whereby Austral would work as a "sub-dealer" of Motransa to distribute International brand trucks to entities in the Ecuadorean public sector. This request was later memorialized unilaterally in a Memorandum of Understanding (the "MOU") transmitted to Motransa on February 14, 2019, by a Navistar employee located in Navistar's Miami office.  The unilaterally drafted MOU is attached hereto as **Exhibit 3**.  Among other things, the MOU purported to direct Motransa to coordinate with Austral to facilitate Austral's sale of International brand trucks to public entities in the construction sector and other public-sector tenders to give priority to Austral's business sales.  Exh. 3, at nos. 2 & 7.

11.      The MOU transmitted to Motransa violated the exclusivity rights granted to Motransa under the Distributor Agreement for the distribution of International brand trucks in the Ecuadorian territory.

12.      Pursuant to the MOU, Motransa was required to verify that Austral complied with the U.S. Foreign Corrupt Practices Act (FCPA) requirements allegedly required by Navistar for the

appointment of any "sub-dealer". Upon further investigation, Motransa became aware that Austral had been sanctioned by the Ecuadorian agency SERCOP[3] for providing "false information or declaring incorrect information within a public procurement procedure" which was deemed a "grave offence" in October 2018. Motransa advised Navistar of this sanction in March 2019 and asked for an approval from Navistar's Compliance Department before moving on with the appointment. Navistar never delivered this approval, but continued to insist on the appointment of Austral as a "sub-dealer".

13.     On August 23, 2019, Mr. Barrios informed Motransa that Navistar designated Austral as a "full truck distributor" of International brand trucks in the Ecuadorian territory in addition to Motransa—in breach of the Distributor Agreement. The letter from Mr. Barrios to Motransa is attached hereto as **Exhibit 4**. The "full truck distributor" distribution rights granted to Austral are broader in scope than the "sub-dealer" status and rights Navistar sought to provide under the MOU. *See* Exh. 3. Motransa has suffered damages as a result of Austral's actions.

14.     Motransa is actively preparing to file an action against Austral for disloyal competition and tortious interference before the Ecuadorian Court (the "Contemplated Proceeding"), and is poised to commence the Contemplated Proceeding upon receipt of the discovery sought by this Application. Motransa has engaged counsel for this purpose and has been advised as to its rights and obligations pertaining the Contemplated Proceeding.

15.     Motransa is not contemplating an action against Navistar under the terms of the Distributor Agreement at this time.

**The Relevance of the Requested Discovery**

16.     Motransa seeks assistance from the United States District Court for the Southern District of Florida to obtain relevant and probative documentary and testimonial evidence from Navistar for use in the Contemplated Proceeding against Austral.

---

[3] SERCOP (Servicio Nacional de Contratación Publica), is the "National Service of Public Contracting", the Ecuadorian agency that regulates sales to the public sector.

17.     To prevail on a claim for tortious interference—which is a type of disloyal competition claim under Ecuadorian law—against Austral, Motransa must show (i) that its competitor, Austral, engaged in communications or other acts with its contractual counter-party, Navistar; and (ii) that such communications or other acts persuaded or caused the contractual counter-party, Navistar, to breach its contract with the plaintiff. Further, a claim for tortious interference does not require litigation against the counterparty to the contract.

18.     Under relevant Ecuadorian procedural law, Article 159 of the Ecuadorian Organic Code of General Procedure, the plaintiff has the legal obligation to submit at the beginning stage of an action, such as the Contemplated Proceeding, all documentary evidence that the plaintiff has in its possession or could have obtained together with its statement of claim  Failure to present such evidence can jeopardize the plaintiff's ability to present the evidence at a later stage in the proceeding.

19.     Accordingly, communications between Navistar and Austral, and internal communications of Navistar related to Motransa and/or Austral in the possession or control of Navistar, from before and around the time Navistar granted a new distribution to Austral, are highly probative and relevant to the Contemplated Proceeding.  Further, presenting this evidence at the initial stage of the Contemplated Proceeding ensures its admissibility during the Contemplated Proceeding.

20.     Motransa seeks documents, information, and testimony from Navistar generally falling within the following categories:

a.     Communications, including correspondences, recorded conversations, text/SMS messages (including texts sent or received via iMessage, WhatsApp, and other messaging applications), letters, emails, memoranda, notes, or other transmittals of information or messages, whether transmitted in writing, orally, electronically or by any other means, between Navistar and Austral regarding Motransa, Austral, International brand trucks, and the Ecuadorian territory and truck market.  These should include, without limitation, communications sent

and/or received from Manuel Barrios, Federico Palomo, Felix Telleria, Elena Jambrina, Bernardo Valenzuela, Cesar Longo, Carl Webb and former Navistar employees James Soules and Jorge Barnitcha.

b.    Communications, including correspondences, recorded conversations, text/SMS messages (including texts sent or received via iMessage, WhatsApp, and other messaging applications), letters, emails, memoranda, notes, or other transmittals of information or messages, whether transmitted in writing, orally, electronically or by any other means, between and among officers, directors, employees and/or agents of Navistar regarding Motransa, the Distributor Agreement, and the Ecuadorian territory and truck market. These should include, without limitation, messages sent and/or received from Manuel Barrios, Federico Palomo, Felix Telleria, Elena Jambrina, Bernardo Valenzuela, Cesar Longo, Carl Webb and former Navistar employees James Soules and Jorge Barnitcha.

c.    Documents, whether in draft or final form, relating to Motransa, Austral, and the Ecuadorian territory and truck market.

d.    Documents exchanged with Austral and/or any third party regarding Motransa, Austral, the Distributor Agreement, and the Ecuadorian territory or truck market.

e.    Documents regarding transfers and/or payments of any kind made by Austral to Motransa.

21.    The information and documents sought through this Application are for use in the Contemplated Proceeding. As set forth above, such evidence is vital and probative to prove the existence of disloyal practices and tortious interference by Austral.

22.     The Discovery Target is an entity that resides or is found in this District, and as such, is a proper discovery target pursuant to 28 U.S.C. § 1782.  Navistar has a registered agent in Florida, and regularly transacts business out of its office located in this district on 8600 NW 36th Street, Suite 304, Miami, FL  33166.  Further, the communications exchanged with Motransa were made by representatives from the Discovery Target's Miami office.

23.     In addition, as the Discovery Target is not expected to become a party to the Contemplated Proceeding, it would not be possible to compel the Discovery Target to provide discovery as it is located outside of the Ecuadorian Court's jurisdiction.

24.     Further, there is no indication that the Ecuadorian Court would not be receptive to the documentary and testimonial evidence sought through the instant Application.  Such evidence will likely be admissible before the Ecuadorian Court and the Application does not circumvent any proof-gathering restriction under Ecuadorian law.

25.     The discovery sought to be served on Navistar is not intrusive or unduly burdensome.  Applicant seeks documentary and testimonial business information that is or should be readily available to businesses like Navistar who isthat engaged in an ongoing business relationship with Austral .  Furthermore, Applicants limit their requests to the period between 2014 and 2019.

### Conclusion

26.     In light of the foregoing, Motransa respectfully submits that all of the requirements of 28 U.S.C. § 1782 are met:

      a.     The Discovery Target is found in this District;

      b.     Applicant is an "interested person" within the meaning of the statute;

      c.     Applicant seeks to obtain documents and testimony for use in a foreign proceeding; and

       d.      The Discovery Target has relevant and probative information concerning the contemplated disloyal competition and tortious interference claims against Austral and the discretionary factors typically considered in this type of ancillary discovery action weigh in favor of the granting of the requested judicial assistance.

27.     No previous application for this relief has been made in the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _5th_ day of December 2019, in _GUAYAQUIL, Ecuador_

By: _____
              Eduardo Carmigniani

*EXHIBIT "1"*

# CONTENTS

Article

Page

## Definitions

| | | |
|---|---|---|
| 1. | Distributor Territory Defined | 2 |
| 2. | Company Defined | 2 |
| 3. | Products Defined | 2 |
| 4. | Term | 3 |

## Purchase, Delivery, Sales and Service of Products

| | | |
|---|---|---|
| 5. | Orders for Products | 3 |
| 6. | Prices | 4 |
| 7. | Price Changes | 4 |
| 8. | Terms of Payment | 4 |
| 9. | Delivery, Risks of Shipment and Routing of Shipments | 5 |
| 10. | Claims against the Company for Shortage or Damage | 5 |
| 11. | Contingencies Affecting Delivery to the Distributor | 5 |
| 12. | (RESERVED) | 5 |
| 13. | Warranty and Warranty Adjustments | 5 |
| 14. | Predelivery, Delivery and After-Delivery Service | 6 |
| 15. | Field Changes | 7 |
| 16. | Changes in Design | 7 |
| 17. | Navistar Parts | 7 |

## Operating Requirements

| | | |
|---|---|---|
| 18. | Distributor Facilities and Activities | 7 |
| 19. | Advertising and Sales Promotion | 9 |
| 20. | Accounting Records and Financial Reports | 9 |
| 21. | Estimates, Inventory and Delivery Records | 10 |
| 22. | Performance Review | 10 |

## General Provisions

| | | |
|---|---|---|
| 23. | Use of Trade Names and Signs | 10 |
| 24. | Termination by Mutual Consent or by Advance Notice | 11 |
| 25. | Termination for Cause | 12 |
| 26. | Liquidated Damages | 13 |
| 27. | Deferral of Termination in the Event of Death or Incapacity | 14 |
| 28. | Delivery After Termination | 14 |
| 29. | Termination Notice | 14 |
| 30. | Distributor Not Company's Agent | 14 |
| 31. | Parties Bound, Effect of Partial Invalidity and Assignment | 14 |
| 32. | Agreement Complete | 14 |
| 33. | Approval of Agreement | 15 |
| 34. | Arbitration and Governing Laws and Language | 15 |



## DISTRIBUTOR SALES AND SERVICE AGREEMENT

This Agreement is entered into this _____**1st**_____ Day of _____**November**_____ ,19 **99** to be effective the **1**st Day of _____**November**_____ ,19 **99** Between Navistar International Export Corporation, hereinafter called "Navistar Export," a wholly-owned subsidiary of Navistar International Transportation Corp., hereinafter called "Navistar", both of which are Corporations of the State of Delaware, United States of America, and both of which have principal executive offices located at 455 North Cityfront Plaza Drive, Chicago, Illinois, 60611, U.S.A., And _____**MORISAENZ, S.A.C.**_____ ,

(State full legal name of company)

(State whether an Individual , Partnership, or Corporation.  If Partnership state names of partners)

with a post office address of _____ ,

hereafter called "Distributor", with a principal establishment for the sale of the Products covered by this Agreement located at

**Av. 10 De Agosto 6398 La "Y"**

(street address)
**Quito**

(city)
**Ecuador**

(country)
as of the effective date of this Agreement, Distributor has the following Branch establishments:

**GUAYAQUIL**

Distributor agrees to provide written notice to Navistar Export prior to the establishment of additional Branches within Distributor's Territory.  In entering into this Agreement, the Distributor has represented to the Company that it does not intend to actively solicit customers for Products covered hereby outside its Territory.

### Definitions

*Distributor*      1.   The "Distributor's Territory" shall mean the trade area within which the Products delivered
*Territory*             under this Agreement will ordinarily be sold by the Distributor and within which the Distributor
*Defined*              shall render service to user-customers as provided in this Agreement.   The Distributor's
                           Territory shall be as follows and shall be **exclusive**:

                           **The country of Ecuador**

*Company*       2.   "The Company" shall refer to Navistar Export, Navistar and its affiliates.
*& Affiliate*
*Defined*              An affiliate shall refer to a manufacturing company (a) located outside the United States and
                           (b) one in which Navistar International Transportation Corporation, directly or indirectly, has
                           an equity interest or, where warranted in the sole judgment of the Company, a licensing
                           agreement.

*Products*       3.   "Products" shall refer to those vehicles, attachments, accessories and parts therefore offered
*Defined*              for sale under the provisions of this Agreement and may include both goods manufactured or
                           supplied by the Company.



2

This Agreement shall cover the following Products as listed by models, by description, or which appear in the numbered price lists as indicated:

**INTERNATIONAL® truck models that appear in price lists:**

**PL282, PL283, PL284.**

Spare parts that appear in price lists:

**PL313, PL315, PL320.**

The following Products are excluded from the above indicated price list(s):

**None**

Navistar Export reserves the right to make additions to and eliminations from such lists without incurring any responsibility to the Distributor. Changes in the lists may be announced to the Distributor by a revision thereto through the issuance of a price bulletin or price letter or by issuance of subsequent lists.

*Term*   4.   The term of this Agreement, unless earlier terminated as hereinafter provided in Articles 24 and 25, shall be for the period beginning on the **1st** day of **November** ,19 **99** and ending on the **31st** day of **October** ,20 04  Thereafter, this Agreement shall be renewed for additional terms of the same duration as the initial term, provided, however, that Navistar Export gives its written approval of any additional term at least ninety (90) days prior to the date of commencement of any such additional term.

**Purchase, Delivery, Sales and Service of Products**

*Orders*   5.   The Products covered by this Agreement which the Distributor purchases shall be covered by
*for*            orders submitted from time to time by the Distributor to the Company, upon forms furnished
*Products*       by the Company or in a format approved by it.

Subject to the provisions of Article 11 hereof relating to contingencies affecting delivery to the Distributor, the Company's obligation to sell Products or cause the Products to be sold to the Distributor and the Distributor's obligation to purchase Products from the Company shall be limited to the Products described in written orders from the Distributor that are accepted by the Company.

The Company will ship Products only upon orders accepted by the Company. Accepted orders will be subject to cancellation by the Distributor only upon written approval of the Company, provided that no such request will be considered unless it is received a minimum of thirty (30) days prior to scheduled production date of Products listed on the order or as established in a policy letter for those Products requiring an earlier notice.

The Distributor will place orders for Products a sufficient time in advance of its needs so that the Company has time for the orderly manufacture and distribution of such Products.



The distributor consents that the Company may insert in any order received from the Distributor the prices and terms applicable to the Products described in such order and their particular descriptions, including numbers and distinguishing marks of such Products and that the Distributor should be bound thereby as if such details, prices, etc. had been contained in the order at the time the Distributor signed it..

*Prices*          6.    Prices, discounts and terms applying to the Products ordered by the Distributor shall be those established by the Company and in effect on the date of shipment of the Products to the Distributor.  When a shipment is made from a point other than a factory, the Company may add an amount to cover handling and transportation charges from factory to point of shipment.  When the Company delivers Products ordered by the Distributor, the Distributor will accept delivery at a location mutually agreed to by the Company and Distributor and pay all transportation charges thereon from the factory to this destination.  The Company, however, may prepay delivery and transportation charges from the factory to destination and make charges therefor to the Distributor.  The Distributor agrees to reimburse the Company for all expenses incurred by the Company for boxing, crating, packing, decking, loading and handling of Products covered by this Agreement and for certain charges established by the Company which are set forth in the Company's price lists, price bulletins, or price letters current on date of shipment.

*Price*          7.    Prices, discounts, terms and all other charges are subject to change without notice at any
*Changes*              time prior to delivery to the Distributor.

*Terms of*        8.    The Distributor agrees to pay for all Products to be shipped under this Agreement as follows:
*Payments*             The Distributor will establish an irrevocable letter of credit issued in favor of the selling company by a bank acceptable to the Company and confirmed by a bank acceptable to the Company in the country of the selling company; such letter of credit shall be advised/issued by a bank in the country of the selling company sixty (60) days in advance of delivery or such other period of time as may be established from time to time by the Company; such irrevocable letter of credit shall be for an amount equal or exceeding the value of the Products being shipped including freight, packing and forwarding charges when advanced by the Company.  Such letter of credit is to stipulate that upon presentation to the bank by the selling company of invoices and appropriate shipping documents specified in the letter of credit payment will be immediately available for the full value of the Products being shipped and the charges.  The currency of payment  will be in the local currency of the company actually selling the Products and the letter of credit shall provide for payment in such currency.  Terms of payment or currency for payment shall be different from those set forth herein only upon the mutual, written agreement of the Distributor and the selling company.  The Distributor agrees to pay any additional amounts which may be necessary to compensate the Company for any deficits in payment receipts resulting from settlement of any obligation in a currency other than the local currency of the selling company.

The Distributor agrees to promptly reimburse the Company for all charges prepaid or advances made by the Company for the Distributor's account.  The Distributor agrees to pay interest at the rate established from time to time by the Company on all overdue obligations; provided, however, that Distributor's agreement to pay interest does not imply that the Company will extend any maturity dates.



Delivery,
Risks of
Shipment
and Routing
of
Shipments

9. Except as may be otherwise specifically agreed to in writing, all Products purchased hereunder are to be delivered to the Distributor F.O.B. factory.  Inland and ocean transportation, freight and insurance will be arranged for Distributor's account as per the Distributor's instructions, and in the absence of instructions, then according to the Company's judgment and discretion.  Storage, insurance, demurrage and any other charges as well as all visas, consular and notary fees, bank charges, export/import fees and duties, if any, shall be paid by the Distributor.

The Company may provide services after delivery at the request of and for account of the Distributor.  If, in performing such services, the Company must appoint an agent with power to execute certain export documentation or otherwise to act, then the Distributor agrees that the Company may appoint such agent solely at the discretion of the Company and for the account of the Distributor.

After delivery, the Company shall not be responsible for any loss or damage in transit.

Claims
Against the
Company
for Shortage
or Damage

10. The Distributor agrees to promptly examine all Products when they are received, and to notify the Company in writing within thirty (30) days of the receipt of such Products of all shortages or damages claimed to have existed at the time of delivery.  Within a reasonable time, the Company will investigate the claim and inform the Distributor of its findings.  Upon acceptance of the claim, the Company will replace items short or damaged or credit an appropriate amount to the Distributor's account.

The Company will not be responsible for shortages or damages at the time of delivery unless claim is made by the Distributor within thirty (30) days of the receipt of the Products.

Contingencies
Affecting
Delivery
to the
Distributor

11. The Company recognizes the desirability of filling orders promptly and agrees that it will at all times use its best efforts to make shipments on or before the dates specified in orders accepted from the Distributor.  The Company, however, shall not be responsible for failure to deliver Products on time or to fill orders when such delay or failure to deliver shall be the result of causes reasonably beyond the Company's control, including but not by way of limitation, fire or other elements, war, riot, strikes or labor disturbances, shortages of materials, any order, decree, law or regulation of any court, government or governmental agency, or by the demand for any Products exceeding the Company's available supply.

If the demand from all sources for any of the Products covered by this Agreement shall at any time exceed the Company's available supply of such Products, the quantity of such Products to be allotted to the Distributor, in order to provide for the equitable distribution of the supply, shall be determined solely by the Company.  In such event the Company shall not be liable for having failed to furnish the Distributor with all or any of the Products covered by accepted orders.

12. [RESERVED]

Warranty
and
Warranty
Adjustments

13. The Company will warrant or cause to be warranted to the Distributor all Products (except tires and tubes, auxiliary equipment, and engines not manufactured by the Company) sold under this Agreement to be free from defects in material and workmanship.  The obligation of the Company under this warranty is limited to the repair or replacement of non-conforming Products, which remedy is expressly agreed to be the exclusive and sole remedy, in accordance with the warranty adjustment policies of the Company, of any part or parts found



defective and of which the Company is advised within thirty (30) days of repair or replacement by the Distributor, provided that such repair or replacement shall have occurred within the warranty period (from date of delivery to the original user-purchaser) or mileage/hour limitations as issued by the Company from time to time and applicable to the Products covered hereby.

NOTE:  DISCLAIMER!!

THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION WARRANTIES <u>OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE</u>.  THE COMPANY HAS NO OTHER OBLIGATIONS OR LIABILITIES AND FURTHER DISCLAIMS ANY LIABILITY FOR INCIDENTAL AND CONSEQUENTIAL DAMAGES.

The Distributor is not authorized to make any representations or assume for the Company any obligations or liabilities in connection with the sale of the Products covered by this Agreement.

The Distributor agrees to furnish without charges for parts or labor normal warranty service to user-customers entitled thereto for Products of the type covered by this Agreement, which are located in the Distributor's Territory.  Such warranty service includes any additional warranty policies, which the Company may from time to time establish with respect to certain Products covered by this Agreement, such as parts or components, other than trucks.  The Distributor has no authority to obligate the Company beyond the express terms of any such additional warranty policies.

When, during the period this Agreement remains in effect, the Distributor repairs or replaces defective parts in fulfillment of the warranty, the Company will compensate the Distributor according to the Company's warranty adjustment policies in effect at the time warranty service is rendered to a user-customer entitled thereto.

In the event the Company determines that warranty service has been made necessary because of the failure of the Distributor making a claim for reimbursement for repair or replacement of warranty parts to properly assemble or adjust the Product at the time of its sale, or to properly perform the pre-delivery and after-delivery service procedures established by the Company, or because of the incorporation by the Distributor of any unapproved modification, accessory item or attachment, or because the Distributor failed to incorporate a recommended modification, then the Company shall be relieved of any obligation to compensate the Distributor under its warranty adjustment policies.

The Company will not be obligated to make warranty compensation unless within thirty (30) days from the date the Distributor furnished, or furnished and installed, the new part to replace such defective part, the Distributor gives the Company written notice of the claim under the warranty.

*Predelivery, Delivery and After-Delivery Service*     14.  Predelivery, delivery, and after-delivery service shall be performed by the Distributor on Products which the Distributor sells in accordance with the policies and procedures established from time to time by the Company.  When requested, the Distributor agrees to render predelivery, delivery and after-delivery service on Products covered by this Agreement which are located in the Distributor's Territory and sold, leased or loaned by the Company or others.  The Company will compensate the Distributor for its services at the rates established by the Company for such purposes and in effect at the time the services were rendered.



*Field*
*Changes*

15.  The Distributor agrees that it will install in accordance with instructions received from the Company, field improvement packages determined by the Company to be advisable.  In reimbursement of the Distributor of the costs of performing this service, the Company will establish a flat fee or labor hours it deems reasonable for the installation of any such field improvement package.  If labor hours have been established, the Company will credit the Distributor with an amount equal to such specified hours multiplied by the Distributor's established regular daytime shop customer hourly labor rate.

*Changes*
*in*
*Design*

16.  The Company reserves the right to make changes in specifications, construction or design of its Products at any time in such manner as it may consider necessary or advisable, and any Products so changed will be accepted by the Distributor in fulfillment of existing orders.  The Company shall not be obliged to furnish the Distributor with such changes on Products previously delivered.

*Navistar*
*Parts*

17.  The Company makes available for purchase by the Distributor parts identified as genuine Navistar International Transportation Corporation parts which are designed for use on the Products covered by this Agreement.

The Distributor agrees that it will not sell or offer for sale for use on the Products covered by this Agreement or use in the repair of those Products, as genuine Navistar International Transportation Corporation parts, any part or parts except those manufactured by or for the Company, or approved by the Company and designed for use on the Company's Products.

**Operating Requirements**

*Distributor*
*Facilities*
*and*
*Activities*

18.  The Distributor understands that each of the following operating requirements is deemed by Navistar Export to be an essential obligation of the Distributor under this Agreement and accordingly the Distributor agrees at its own cost and expense:

(a)  To achieve a reasonable share of the market for the Products and service covered by this Agreement in the Distributor's Territory.  (In gauging the Distributor's performance under this subsection, Navistar Export will compare the Distributor's market penetration with those of other Navistar Export Distributors selling like Products and service in similar locations and will also compare the Distributor's market penetration with those of competitive vehicles, parts and service in terms of price and characteristics to those offered by the Distributor.  Navistar Export will consider any factors relevant to each Distributor's performance, so that while the dominant tests are to be objective ones, individual equities of the Distributor shall temper the results of such tests);

(b)  To provide and maintain physical facilities commensurate with the sales possibilities and service needs in the Distributor's Territory, including the following:

(1)  A building (or buildings) of acceptable appearance and sufficient size for properly displaying, assembling, handling and warehousing the Products delivered under this Agreement, and an outside area of acceptable appearance and sufficient size for the display of the Products and equipment and for other operating requirements;

(2)  Service tools, service vehicles, diagnostic equipment, quality control equipment, shop space and service library adequate to meet the service requirements of the Products covered by this Agreement which are being operated within the Distributor's Territory and for reconditioning used Products acquired by the Distributor;



(3) Parts bins and equipment necessary for the attractive display and efficient storage and handling of parts, attachments and accessories;

(4) Office furniture and equipment that will enable the Distributor to maintain complete records of its business transactions, in keeping with sound business practice;

(c) To provide and maintain in good condition, in conspicuous and appropriate locations inside and outside of its principal and branch establishments, product and service signs approved by Navistar Export identifying the establishment as authorized NAVISTAR INTERNATIONAL TRANSPORTATION CORPORATION sales and service outlets for the Products covered by this agreement;

(d) To maintain the principal and branch establishments at the places referred to in page 2 of this Agreement, and not to move them to different locations, close them nor to establish other offices, service facilities or new or used equipment lots without prior written notice to Navistar Export;

(e) To provide at all times sufficient working capital and net worth to enable the Distributor to fulfill properly all of its responsibilities and duties under this Agreement;

(f) To engage, train and maintain sales, parts, service and accounting personnel sufficient to obtain a fair share of the sales possibilities in the Distributor's Territory for the Products covered by this Agreement, and to service promptly and efficiently Products in use in the Territory;

(g) To maintain an inventory (including an adequate inventory control system) of Products in keeping with the sales possibilities in the Distributor's Territory;

(h) To comply with the policies regarding the predelivery, delivery and after-delivery servicing of Products and field changes as set forth in Articles 14 and 15 hereof, and upon delivery to instruct the user concerning the routine maintenance, operation and proper manner of adjustment of same;

(l) To provide warranty service, as provided in Article 13 hereof, to each user of Products of the type covered by this Agreement who shall be entitled to such service;

(j) To provide inventory, sales, parts and service reports provided for in this Agreement within the time periods specified or as requested by Navistar Export from time to time;

(k) To use the promotional and advertising materials and services made available by the Company and to advertise the Company's Products as provided for in this Agreement or as requested by Navistar Export from time to time;

(l) To cause the key management members of the Distributor's staff and other personnel to attend Company-conducted seminars, Product, sales, parts and service meetings;

(m) To aggressively promote the sale of vehicles, parts and service covered by this Agreement of the type for which a demand exists within the Distributor's Territory; and



(n) To cooperate with Navistar Export in the conducting of the Distributor performance review provided for in this Agreement.

(o) To meet or exceed performance standards and/or sales goals established by Navistar Export. The standards and/or goals will specify sales levels for trucks, parts, inventories, service facility standards, and any other changes or improvements that Navistar Export determines are essential for continuation or renewal of this Agreement. The performance standards and/or sales goals will be issued at least annually, and will take into account such factors as the Distributor's location, sales history, market share, competition, and other relevant factors.

(p) Other:

**See Side Letter between Morisaenz and Navistar Export dated November 1st, 1999**

---

*Advertising and Sales Promotion*

19. To promote the sales of the Products, Navistar Export will advertise such Products in international and regional media selected by it, to the extent it considers practical and desirable, depending on market conditions.

Navistar Export agrees that it will make available to the Distributor advertising literature, catalogs, photographs and other advertising and sales promotion material developed to assist the Distributor in promoting the sale of Products covered by this Agreement and will assist in the development of these local promotions. Navistar Export will furnish certain advertising material to the Distributor without charge, but may limit the quantities of such advertising material to the amounts which, in Navistar Export's judgment, are commensurate with the Distributor's operations and sales potential. Navistar Export reserves the right, however, to make reasonable charges to the Distributor for any such advertising material (including charges for postage and transportation) supplied pursuant to an order by the Distributor.

The Distributor agrees to provide local advertising and sales promotion programs for Products of the types covered by this Agreement with the frequency and extent required by the sales potential of the Distributor's Territory. The Distributor also agrees to make suitable use of the advertising and promotional programs and materials made available by Navistar Export.

Navistar also may establish cooperative advertising plans from time to time. The terms and procedures of such plans will be established by Navistar Export and offered to the Distributor, it being understood that they are offered as an assistance for local advertising and promotion and not to underwrite all of the Distributor's advertising and promotion activities in this area and that Navistar Export may change or withdraw any such plan at any time.

The Distributor also agrees that it will maintain a current list of prospective purchasers of Products of the type covered by this Agreement in its Territory, and will, upon request, make such list available to Navistar Export for developing advertising and sales promotional programs in which the Distributor will participate.

*Accounting Records and Financial Reports*

20. In order to assist Navistar Export in evaluating the Distributor's performance, sales and service capacity and for other legitimate purposes under this Agreement, the Distributor agrees to maintain accounting records that will at all time accurately reflect the financial condition of its business and enable it to prepare monthly operating statements. The Distributor agrees to furnish financial (balance sheet) and operating (profit and loss) statements to Navistar Export in a form satisfactory to Navistar Export, monthly or quarterly as requested by Navistar Export. In addition, the Distributor will send its full, detailed and audited annual financial and operating statements to Navistar Export as soon as possible after the close of the Distributor's fiscal year, but no later than 90 days after such closing.



*Estimates,*
*Inventory*
*and*
*Delivery*
*Records*

21. To help the Company to plan its manufacturing operations and to make the necessary commitments for materials and labor, the Distributor agrees that whenever requested it will promptly furnish to Navistar Export, on forms acceptable to Navistar Export, up-to-date and accurate information regarding new Products in its inventory, unfilled orders, and estimates of the Distributor's future sales of Products.  Such estimates shall not be binding either on the Distributor or on Navistar Export but will be used for informational purposes only.

The Distributor will maintain a record relating to each major Product sold by it, showing the date of delivery thereof, the name and address of the buyer and the serial numbers, if any, of the Product.

The Distributor will also maintain accurate parts inventory control records to assist it in maintaining an inventory of parts to provide proper service to users in its Territory of the Products covered by this Agreement.

At any time, upon request, the Distributor will give Navistar Export's representative full information regarding Products on hand and Products sold.

*Performance*
*Review*

22. In order that a satisfactory level of Distributor performance may be maintained, Navistar Export will, from time to time, review with the Distributor the degree to which it has satisfied the performance and operating requirements established in this Agreement.  The Distributor agrees to cooperate with Navistar Export by making available to it, at such time as may be convenient for such review, those sales, service and financial records which shall be necessary to adequately analyze the operation of the Distributor's business and by assuring, upon the occasion of such review, the presence of those distributorship personnel whose attendance would contribute to the overall value of the review.    Conclusions and recommendations developed from the review shall be incorporated into a written report which shall be supplied to the Distributor and Navistar Export for joint study and the initiation of appropriate action.

## GENERAL PROVISIONS

*Use of*
*Trade*
*Names*
*and*
*Signs*

23. The Distributor agrees to market all Products covered by this Agreement under the trademarks, trade names, model designations, labels and designs used on such Products by the Company.

The Distributor agrees that any sign, stationery, letterheads, business forms, trade bulletins, building directories, labels or the like which identify trademarks or trade names of the Company must meet Company standards with regard to such usage.

The Distributor further agrees that during the term of and after the termination of this Agreement, however occurring, the Distributor shall not do any of the following in Distributor's Territory or elsewhere in the world:

(a) Use any trademark, trade names, model designation label or design of the Company, or any words, number labels or designs confusingly similar thereto, in connection with the distribution of any goods not manufactured by the Company or those duly authorized by it; or

(b) Apply for or seek registration at any time of any trademark, trade names, model designation, label or design of Navistar International Transportation Corporation, or any words, numbers, labels or designs confusingly similar thereto (it being agreed that, when called upon in writing by the Company at any time so to do, Distributor shall, at the Company's election, either assign to Navistar International Transportation Corporation in writing any rights which the Distributor might have therein or release and cancel any rights of record which the Distributor might have therein); or



(c) Use any trademark, service mark, certification mark, trade name, model designation label or design of Navistar, or any words, numbers, labels or designs similar thereto, in any corporate or trade name without Navistar's specific written permission in advance (such permission if granted to expire concurrently with the termination of this   Agreement,  and the use thereof to be discontinued and such corporate or trade name to  be        removed from all corporate and other official registries forthwith upon termination of this Agreement); or

(d) Use any label or design similar in appearance to any label or design used by Navistar on any product bearing its trademarks, service marks, certification marks, or trade  name, in connection with the distribution and sale of any product (even though not distributed under the trademark or trade name of Navistar International Transportation Corporation) not manufactured by Navistar or those duly authorized by it; to

(e) Do anything or commit any act which might prejudice or adversely affect the validity of any trademark, service mark, certification mark, trade name, label or design, any registrations thereof, and Navistar International Transportation Corporation's ownership thereof.

Upon termination of this Agreement, however occurring, Distributor shall forthwith cease to use the trademarks, service marks, certification marks, trade names, model designations, label or designs of Navistar International Transportation Corporation, or any similar trademarks, service marks, certification marks, trade name, model designations, labels or designs, in any manner, including but not limited to use upon stationery, letterheads, business forms, trade bulletins, building directories, offices, signs, warehouses, labels, in telephone listings, and in or on any other items whatsoever.

The Distributor agrees not to use said trademarks, service marks, certification marks, trade names, model designations, labels or designs on or with respect to Products which it substantially modifies or alters for resale.

The Distributor further agrees to protect the trademarks, service marks, certification marks, trade names, model designations, labels or designs of Navistar International Transportation Corporation by appropriate provisions, similar to the above, in any agreements of resale to local dealers or jobbers in Distributor's Territory who might otherwise acquire rights in said trademarks, service marks, certification marks, trade names, model designations, labels or designs adverse to the interests of the Company or to the rights of the manufacturers of the goods sold by the Company.

*Termination by Mutual Consent or by Advance Notice*

24. This Agreement may be terminated at any time by mutual consent or by either party, without cause, by giving written notice of termination to the other party no less than sixty (60) days prior to the proposed termination date.

*Termination for Cause*

25. Notwithstanding the provisions of Article 24 above:

(a) In the event of the occurrence of any one or more of the following, Navistar Export may terminate this Agreement for cause immediately upon written notice given to the Distributor in the manner provided in Article 29 hereof:

(1) The Distributor defaults in the payment of any of its obligations owing to the Company.

(2) The Distributor defaults in any obligation as set forth in this Agreement and fails to correct such default after notice.



11

(3) The admitted insolvency of Distributor, or any member of the Distributor's firm if a partnership, or the institution of voluntary or involuntary proceedings in bankruptcy or other insolvency laws, or for an arrangement with creditors or for corporate reorganization or dissolution of the Distributor.

(4) If the Distributor is a corporation, any change in the principal officers, directors, management or stock ownership which, in the opinion of Navistar Export, will effect a substantial change in the operation, management or control of the Distributor.

(5) The falsification of any record or reports or any material misrepresentation by the Distributor.

(6) The death or incapacity of Distributor or any member of Distributor's firm if Distributor is an individual or a partnership.

(7) Any change in the membership of Distributor's firm if Distributor is a partnership; or

(8) Any change in the business structure (individual, partnership or corporation) of the Distributor.

(9) Failure by the Distributor to place orders on a regular basis with the Company which in the opinion of the Company constitutes a failure by the Distributor to comply with the terms and conditions of this Agreement.

(b) If any jurisdiction where this Agreement is to be performed requires a license of the Distributor or Navistar Export, either the Distributor or Navistar Export may terminate this Agreement immediately upon written notice given as provided in Article 29 hereof in the event:

(1) The Distributor or Navistar Export fails to secure or maintain or renew such license, or

(2) Such license of the Distributor or Navistar Export is suspended or revoked for any reason.

(c) Since this Agreement is personal, it shall automatically terminate:

(1) Upon the Distributor becoming defunct or otherwise losing its legal existence as constituted at the time of this Agreement if Distributor is a corporation, or

(2) Upon the assignment or attempted assignment of this Agreement or any interest therein or any right thereunder by the Distributor.

(d) The termination or expiration of this Agreement by or immediately preceding the execution and delivery of a new Navistar Export Distributor Sales and Service Agreement between the parties hereto or their successors in interest shall not be considered a termination under Articles 24 and 25 hereof, unless otherwise specified in such new agreement.

*Liquidated*  26. Distributor and Navistar Export agree that this Agreement is, and for all purposes shall be
*Damages*       interpreted to be, a supply contract and not a commercial agency contract.  Nevertheless, should this Agreement ever be interpreted to be such a commercial agency contract, or



12

anything other than a supply contract, Navistar Export and the Distributor agree that to the extent there are damages resulting from either party's termination, such damages shall be based on this Agreement being only a supply contract.  Navistar Export and the Distributor expressly waive any protections either may otherwise receive under any law if such protections would provide benefits or other damages to Navistar Export or the Distributor in addition to those which are provided for in this Article 26.

The Distributor and Navistar Export agree, if there is a termination of this Agreement by either party, which is subsequently determined to be wrongful pursuant to Article 33 hereof or by any Court which may be properly considering such question that it is difficult to determine the amount of damages, if any, that would result to either party as a result of such a wrongful termination by the other party.  Therefore, the Distributor and Navistar Export agree that in the event there is a proper determination of a wrongful termination by either Distributor or Navistar Export, the liquidated damages (which term shall not be construed to include debts owing by either party to the other as a result of the transaction of business pursuant to this Agreement) to which the non-terminating party shall be entitled, as reimbursement and not as a penalty, shall be as follows:  In the event that Navistar Export shall have initiated the wrongful action, the Distributor shall be entitled to liquidated damages equaling the amount of net profit the Distributor earned from the sale of Products pursuant to this Agreement during the Distributor's fiscal year last preceding the date of such wrongful termination by Navistar Export.  The amount of such profit from the sale of Products shall not exceed that which is otherwise included in the financial statements which the Distributor submitted to Navistar Export as required by Article 20 hereof; in the event that the Distributor shall have initiated the wrongful termination action, Navistar Export shall be entitled to liquidated damages equaling the amount of the net profit Navistar Export earned from the sale of Products in the Distributor's Territory during Navistar Export's fiscal year last preceding the date of such wrongful termination by the Distributor.

In the event either party terminates this Agreement in accordance with the provisions of Articles 24 or 25 hereof, and such termination is not subsequently determined to be wrongful as is contemplated by the immediately preceding paragraph of this Article 26, the non-terminating party hereby agrees that its damages (which term shall not be construed to include debts owing by either party to the other as a result of the transaction of business pursuant to this Agreement), if any, resulting from such termination shall have been fully compensated by the profits that party earned from the sale of the Products during the life of this Agreement prior to such termination.

*Deferral of Termination in the Event of Death or Incapacity*

27. In the event of the death or incapacity of the Distributor if the Distributor is an individual or the death or incapacity of a partner if the Distributor is a Partnership, Navistar Export will, provided,

(a)  written request therefor is made within thirty (30) days of such death or incapacity by the legal representative(s) of the deceased or incapacitated person and all other persons having an ownership interest in the business, and

(b)  necessary approval to continue to operate the business is obtained from the proper legal authorities,

defer the termination and continue to operate under the provisions of this Agreement, for a period, to be determined by Navistar Export, of not less than ninety (90) days nor more than



one year from the date of such death or incapacity, during which period the family or the family and other partners may attempt to reorganize the Distributorship to the satisfaction of Navistar Export so that the reorganized business may continue as a distributor, negotiate a sale to another distributor satisfactory to Navistar Export, or liquidate the Distributorship in an orderly manner.  In the event the effective date of termination is extended as provided herein, this Agreement shall automatically become terminated at the expiration of such period.

*Delivery After Termination*

28.  The termination of this Agreement shall, unless otherwise agreed between the parties, cancel all unfilled orders accepted from the Distributor without liability on the part of either party.

*Termination Notice*

29.  Any notice of termination of this Agreement by Navistar Export to the Distributor shall be signed by a corporate officer of Navistar Export and may be given to the Distributor by delivery to it personally or to one of its officers or partners, or by registered air mail by depositing the same in a post office or letter box in a prepaid, sealed wrapper, addressed to the Distributor at its latest post office address as shown by Navistar Export's records, and such notice shall be deemed to be given when the same shall be so mailed.  Following such notice of termination of this Agreement, the Distributor shall have no claims to compensation for the sale of the Products covered by this Agreement unless such Products covered by such sales are shipped so as to arrive in the Distributor's Territory prior to the proposed termination date.

*Distributor Not Company's Agent*

30.  The Distributor is not the Company's agent in any respect and is not authorized to incur any obligations or make any promises or representations on its behalf.

*Parties Bound, Effect of Partial Invalidity and Assignment*

31.  This Agreement shall be binding upon the parties hereto, their heirs, executors, administrators or successors.

Since this is a personal agreement upon the part of the Distributor, the Distributor may not assign it, or any rights herein, or any part thereof.  If any provision of this Agreement, or the application of such provision shall be held illegal or unenforceable, the remainder of this Agreement or the application of such provision to other persons or circumstances shall not be affected thereby.

*Agreement Complete*

32.  This Agreement contains the entire agreement between the Company and the Distributor and supersedes all previous agreements between the parties pertaining to the sale of Products covered by this Agreement.  There are no oral agreements of any kind, and no erasure of any printed portion of this Agreement (except filling of blank spaces and lines) will be binding upon Navistar Export unless in writing and signed in its behalf by one of its corporate officers at its principal office in Chicago, Illinois.  No person other than one of Navistar Export's corporate officers at Navistar Export's principal executive office in Chicago, Illinois, has authority to waive any of the provisions of this Agreement or to modify or change any of its terms, and then only in writing.

No waiver by the Company of any default in the performance of any part of this Agreement by the Distributor shall apply to or be deemed a waiver of any prior or subsequent default hereunder.

The copy of this Agreement retained by Navistar Export shall be considered the original and shall control in case of any variation between it and the duplicate retained by the Distributor.



14

| | | |
|---|---|---|
| *Approval of Agreement* | 33. | This Agreement shall not be binding upon Navistar Export until approved on behalf of Navistar Export by a corporate officer at its principal office in Chicago, Illinois, U.S.A., and all of the provisions hereof shall be construed and given effect according to the laws of the State of Illinois, U.S.A. |

If the Company should, after the expiration or termination of this Agreement, supply the Distributor with any of the Products covered by this Agreement, such deliveries shall not themselves imply a continuation or renewal of this Agreement or the granting of selling rights for any definite period, but all orders accepted by the Company will be executed under the stipulations made therein. Any correspondence exchanged between Navistar Export or its representatives and the Distributor may not be interpreted as an extension or renewal of this Agreement, even if in any such correspondence, reference is made to it as a whole or to any particular paragraph or sentence thereof.

| | | | |
|---|---|---|---|
| *Arbitration and Governing Laws and Language* | 34. | (a) | Except as is otherwise expressly provided herein, all disputes, controversies or differences arising between the parties out of or in relation to or in connection with this Agreement, or any breach or default hereunder (including, but not limited to, a dispute concerning the existence or continued existence of this Agreement, and the validity of the arbitral provision) which cannot be settled amicably shall be subject to arbitration. |

Arbitration shall be conducted in accordance with the procedures and rules set forth in the UNCITRAL arbitration rules except as modified herein.

The arbitral tribunal shall have its seat, and arbitration proceedings shall take place, in Zurich, Switzerland.

The arbitral tribunal shall consist of three arbitrators. The Distributor and Navistar Export shall each appoint one arbitrator. If the respondent does not designate an arbitrator within thirty (30) days after the date of notification by petitioner, such arbitrator shall be named by the President of the Commercial Court of Zurich or, in the case of his impediment or nonaction, by the Supreme Court of the Canton of Zurich as provided in Article 364 of the Swiss Code of Civil Procedure. The two arbitrators shall then select a third arbitrator who shall serve them as Chairman. If the first two arbitrators are unable to agree upon a third arbitrator within thirty (30) days after the date of their appointment, such third arbitrator shall be named in the same manner as set forth in the third sentence of this paragraph.

The arbitration proceedings (including all written communications to or other filings with the arbitral tribunal) shall be in English and, therefore, all arbitrators must be proficient in the English language. A decision by two of the three arbitrators shall be required to resolve any issue. The arbitrators shall render their award in writing indicating the basis of their opinion.

The arbitration tribunal's decision and award shall be final, and judgment thereon may be entered in any court having jurisdiction over the party against whom the award has been rendered. The parties shall comply in good faith with the arbitration tribunal's decision.

| | | |
|---|---|---|
| | (b) | As to all matters of substantive law, the arbitrators shall apply the laws of the State of Illinois, U.S.A., notwithstanding any Illinois doctrine of renoir. |
| | (c) | The costs of the arbitration shall be borne equally by the parties except that each party shall bear its own expenses for its own attorneys and witnesses. |



(d)   The English version of this Agreement, notwithstanding translation hereof into any other language, shall be the only authentic one and shall be controlling in all respects.

(e)   The provisions of this Article shall not be construed to limit the Company's ability to sue the Distributor in any court of competent jurisdiction for the collection of money owing or allegedly owing by the Distributor to the Company.

**MORISAENZ, S.A.C.**
(Distributor)

By _____

**NAVISTAR INTERNATIONAL EXPORT CORPORATION**
(Company name)

By _____
Carlos Currlin
Regional Vice President – Latin America

APPROVED AT Chicago, Illinois, U.S.A., this ____ day of _____ , 19 ____ .

NAVISTAR INTERNATIONAL
TRANSPORTATION CORP.

By _____

*EXHIBIT "2"*

**AMENDMENT TO**
**TRUCK DISTRIBUTOR SALES & SERVICE AGREEMENT**

THIS AMENDMENT TO TRUCK DISTRIBUTOR SALES & SERVICE AGREEMENT ("Amendment") is entered into this 15th day of December, 2011, effective as of the 31st day of October, 2011, between NAVISTAR GLOBAL OPERATIONS CORPORATION, formerly known as Navistar International Export Corporation ("Navistar Export" or "Navistar Global"), and MOTRANSA CA ("Distributor").

The following provisions will amend the Truck Distributor Sales & Service Agreement between Navistar Export and Distributor dated as of November 1, 1999 ("Agreement"). In the event of any conflict between the terms of the Agreement and this Amendment, the terms of this Amendment will control. All capitalized terms not defined in this Amendment will have the meanings set forth in the Agreement.

Notwithstanding cause as set forth in Article 25 of the Agreement, both parties agree to waive the ninety (90) day written approval period in Article 4 of the Agreement.

1. ***Term***. Article 4 of the Agreement is deleted and replaced with the following:

   "The amended term of this Agreement, unless earlier terminated as provided in Articles 24 and 25, will be for a period beginning on the expiration date of the latest renewal of the Agreement and ending on the 31st day of October 2012. Thereafter, this Agreement shall be renewed for additional terms of the same duration as the initial term, provided, however, that Navistar Global gives its written approval of any additional term at least ninety (90) days prior to the date of commencement of any such additional term."

2. ***Foreign Corrupt Practices Act and Trade Compliance.*** A new Article 35 is added to this Agreement as follows:

   "The Distributor understands that each of the following requirements is deemed by Navistar Global to be an essential obligation of the Distributor under this Agreement and accordingly the Distributor agrees:

   (a)    that Dealer will conduct its business operations in accordance with all applicable laws and regulations including, but not limited to, the United States Foreign Corrupt Practices Act ("FCPA"), the United Kingdom's Bribery Act ("UK Bribery Act") U.S. Foreign Asset Control Laws ("OFAC"), and U.S. Export Control Laws, and will not attempt to directly or indirectly improperly obtain any benefit by payments, the giving of anything of value or other actions contrary to any applicable law or regulation; and

   (b)    that Dealer has not made and will not make, directly or indirectly, any payment of funds (A) to any government official or any representative or employee of a government entity, (B) to any employee or representative of any purchaser, or (C) which is illegal under any applicable law in the countries in which Dealer does business in, including, but not limited to, the FCPA and UK Bribery Act, all as may be amended from time to time; and

(c)     that the Dealer has not requested the return, and will not accept the return, directly or indirectly, of any portion of the funds paid by any purchaser or end-user of products or services, nor will any director, officer, or employee of the Dealer so request or accept any such funds; and

(d)     that neither Dealer nor any employee, agent or principal of Dealer nor any of their immediate families is or will be (A) a government official or any employee or representative of a governmental entity, or (B) an official or employee or representative of or holder of a beneficial interest in any purchaser of Products or Services sold by Dealer pursuant to this Agreement, without the written approval of Navistar; and

(e)     that no government entity or ultimate purchaser, with the exception of leasing and transportation businesses owned by the Dealer, has or will have a beneficial interest in Dealer's business; and

(f)     that Dealer will investigate the identity of the ultimate end-user of the goods to be sold and will provide documentation as requested by Navistar regarding the ultimate end-user and the use of goods to be sold; and

(g)     that Dealer hereby agrees that it will put into place for Navistar and all related companies, policies, procedures and guidelines with respect to all applicable laws and regulations including, but not limited to OFAC, U.S. Export Control Laws, the FCPA and the UK Bribery Act and that Dealer will provide compliance and anti-corruption training to its employees and representatives as well as employees and representatives of all related companies on an as-needed basis and not less than annually. Dealer further acknowledges that Navistar shall have the right to terminate this Agreement if Dealer fails to institute such policies, procedures and guidelines within sixty (60) days of the effective date of this Agreement or if Dealer fails to provide the above-referenced training on an annual basis; and

(h)     that Dealer acknowledges that Navistar's corporate policy prohibits payments made to induce a government official to perform a routine duty or service, commonly referred to as "facilitating payments" and Dealer agrees that no such payments will be made or offered by Dealer to carry out its obligations in connection with this Agreement; and

(i)     that Dealer shall obtain and maintain any and all licenses, concessions and permits Dealer is required to obtain under any applicable law or regulation for Dealer to carry out its obligations in connection with this Agreement; and

(j)     that the Dealer has not been convicted of, pleaded guilty to or been charged with any offense involving fraud, corruption or bribery in any jurisdiction or country; and

(k)     that the Dealer shall keep accurate books and records and shall preserve all books, records, data and evidence of procedures and policies relating to the Dealer's compliance with the foregoing and shall make all books, records, data and evidence of procedures and policies relating to compliance with the foregoing available for examination and audit by upon request of the Company or

2

the Government or the U.S. Government and shall provide the reasonable assistance of Dealer's employees with knowledge of compliance efforts in connection with any such examination or audit; and

(l)    that Dealer will execute a certificate containing the above representations and warranties as reasonably requested by Navistar throughout the term of this Agreement; and

(m)    that Navistar shall have the right to terminate this Agreement immediately upon forming a reasonable belief that Dealer has defaulted or has otherwise failed in the performance of any of the requirements of this Anti-Corruption and Trade Compliance Section as set forth above.

3.  *Anti-Terrorism.*  A new Article 36 is added to this Agreement as follows:

"The Distributor and its principals understand the requirements of, and will abide by, all United States government economic sanctions requirements. The Distributor represents and warrants that neither the Distributor nor any of its direct or indirect principals, employees, or agents is a person subject to trade restrictions under United States law, including (without limitation) the International Emergency Economic Powers Act, 50 U.S.C. §§1701 et seq., The Trading with the Enemy Act, 50 U.S.C. Appx. §§1 et seq., or any Executive Orders or regulations promulgated thereunder (including Executive Order 13224 of September 24, 2001, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, and the Specially Designated National and Blocked Person List) ("Anti-Terrorism Laws"). Neither the Distributor nor its principals will engage in any activity that would expose Navistar Global to a risk of criminal or civil penalties under applicable United States law. Any violation of the Anti-Terrorism Laws by the Distributor or its principals, or any blocking of the Distributor's or its principals' assets under the Anti-Terrorism Laws, will constitute good cause for immediate termination of this Agreement."

4.  *Effectiveness of Agreement.*  To the extent not amended herein, all other terms and conditions of the Agreement will remain in full force and effect. No references to the amendments contained herein need to made in any instrument or document at any time referring to the Agreement and any such reference is deemed to be a reference to the Agreement as amended by this Amendment.

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the date of the Amendment.

Navistar Global:                      Distributor:

NAVISTAR GLOBAL OPERATIONS      MOTRANSA CA
CORPORATION

By: _____        By: _____

Name:  Phil Christman              Name:  FERNANDO BANDERS
Title:  President, Global Truck Operations  Title:  GERENTE GENERAL

1249475\w-1                         3

*EXHIBIT "3"*

SEQUOR LAW, P.A.

Memorandum of Understanding

Present at the meeting Jan. 16, 2019

- Motransa – Fernando Banderas, Joaquín Ribadeneira, Alfonso Morales
- Austral – Pedro Vintimilla
- Navistar: Manuel Barrios, Federico Palomo

Ref: Austral to become a Truck Sub-dealer.

Date: February 14, 2019

---

Navistar, Inc., "Manufacturer" believes that there are opportunities to increase the overall results in the Ecuadorian market, one way to improve coverage and maximize all opportunities is for Motransa, "Dealer," to work with Austral as a truck "Sub-Dealer" in the government and construction sectors with straight trucks, parts and service.

Motransa has been our truck distributor for over 75 years and has the respect of our trucks customers in the private sector, Austral with limited products has done a good job marketing buses.

1. Sub-dealer

Austral to work as a sub-dealer for Motransa in the Ecuadorian market.

2. Market Segments

Motransa currently participates in selective public tenders such as Municipalidad de Guayaquil and Fire Dept., these two will continue to be worked directly by Motransa.  Additionally, from time to time Motransa has successfully participated with Astap on public tenders that require street sweepers and Vacuum sewer trucks, will continue to do it with specialized equipment

With close coordination between Motransa and Austral, Austral will have priority on all public-sector tenders. Austral will also be allowed to sell straight trucks to their selected customers in the construction segment.   It is required that there be strong dealer coordination on the business opportunities between all the parties involved.

3. Product - Model

Models for Austral: straight trucks such as 7600 / HV / 4300 that are currently available for the market. Every new configuration that Austral believes is needed for their market segment would need to be coordinated between Motransa and Austral. Navistar to provide all required support on proposal.

4.  Pricing

Both Austral and Motransa may use the same SPA on orders, however, a mark-up will be reserved for Motransa:  7600 $1,500, HV/4300 $1000.

1

5. Order Placing

Austral will places orders directly in the MIOSS systems under their own credit line.

6. Order Invoicing

Navistar will invoice directly to Austral, utilizing Austal's current credit line with Navistar.

7. Importation in Ecuador

Austral will import the trucks into Ecuador and Motransa will facilitate the required documentation such as homologation certificates, etc. Additionally, Austral may purchase stock unit that Motransa has in the market.

8. After Sales Support – Warranty

Austral will be able to perform the following tasks:

- PDI – Austral to do their own PDI
- Warranty- provided by Austral.
- Certifications - Austral will need to get certification for ISB / ISL and other Cummins engines for the market.
- Motransa to provide support as needed.


9. Parts Sales

Austral may purchase parts directly from Navistar for those straight trucks that they are selling.

10. Regular Meeting

For the first year, there will be quarterly meetings between Navistar/Motransa/Austral to evaluate relationship and to adjust any issue that requires special attention.  Starting on the 2nd year the meetings will be once per year. Additionally, problems need to be quickly addressed when they come up, so an action plan to correct it can be stablished.

*EXHIBIT "4"*

SEQUOR LAW, P.A.

**Navistar, Inc.**
8600 NW 36th Street, Suite 304
Miami, FL 33166 USA

P: 305-599-0625
C: 305-606-9935
E: Manuel.Barrios@navistar.com

**Manuel Barrios**
Regional VP
Latin America & Caribbean

*A NAVISTAR COMPANY*

August 23, 2019


Fernando Banderas
General Manager
Motransa, C.A.

Ref.:  2nd Truck Distributor for Ecuadorian Market

Dear Fernando,

As we have discussed for the last several years, reiterated during our visit to Quito in early January 2019, and finalized in our discussion with Alfonso Morales on August 5, 2019, Navistar, Inc. appointed a second truck dealer for the Ecuadorian market.  This decision was not taken lightly.  It was decided that a second dealer will strengthen Navistar's in-country distribution and overall market share.

Pursuant to your request for this decision in writing, please accept this letter as notice that Navistar, Inc, named Austral Cia Ltd as a full truck distributor in Ecuador in addition to Motransa, C.A.  This is now in effect

In the case of buses, if Motransa is interested in becoming a bus distributor, we are ready to discuss this possibility.

Best regards,

Manuel Barrios
Regional VP
Latin America and Caribbean

*EXHIBIT "B"*

AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the
Southern District of Florida

| | | |
|---|---|---|
| IN RE APPLICATION OF | ) | |
| Motransa S.A., For Judicial Assistance | ) | Case No. |
| Pursuant to 28 U.S.C. § 1782 | ) | |

### SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:   **Navistar, Inc.**
      c/o Corporation Service Company, Registered Agent
      1201 Hays Street
      Tallahassee, FL 32301-2525

✓  *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment: **See Exhibit A**.

| Place:   **Sequor Law, P.A.**<br>          1111 Brickell Avenue, Suite 1250<br>          Miami, Florida 33131 | Date and Time:<br>(01/___/2020) at 10:00 a.m. |
|---|---|

The deposition will be recorded by this method:  Court Reporter

✓  *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  **See Exhibit A**.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   November 30, 2019.

                    *CLERK OF COURT*

                                        OR

_____          _____
    *Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorneys representing Motransa, S.A., who issue or request this subpoena, are: **Arnoldo B. Lacayo, Esq.**, alacayo@sequorlaw.com and **Juan J. Mendoza, Esq.**, jmendoza@sequorlaw.com, (305) 372-8282.

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Case No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ⌐   I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

    ⌐   I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT "A"

## DEFINITIONS

As used in this request, the following words shall have the following meanings:

1.        "You," "Your," or **"Navistar"** means the recipient of this Subpoena, **"Navistar, Inc**.", together with its parent company(ies), subsidiaries, affiliates, employees, executives, managers, agents acting within the scope of such agency, and any other entity or person over which You may have custody, control, or hold any position relating to same.  Agents include but are not limited to employees, consultants, brokers, attorneys, representatives and any other person acting on Your behalf, including, without limitation, Manuel Barrios, Federico Palomo, Felix Telleria, Elena Jambrina, Bernardo Valenzuela, Cesar Longo, Carl Webb and former Navistar employees James Soules and Jorge Barnitcha.

2.        "Communication(s)" means any oral, written or electronic transmission of information, including, but not limited to, electronic mail (sent or received), text/SMS messages (including sent or received via iMessage, WhatsApp, and other messaging applications), conversations, meetings, discussions, telephone calls, telegrams, telecopies, telexes, seminars, conferences, messages, notes, memoranda or ESI.

3.        "Document" or "Record" means and includes, without limitation, any kind of written, typewritten, printed, recorded material or ESI whatsoever, whether produced, reproduced or stored on paper, cards, tape, film, electronic facsimile, computer storage device or memory, or other media or data compilation from which information may be obtained, including accounts, address books, addenda, agreements, albums, articles, bank statements, blueprints, books, calendars, charts, checks (both front and reverse sides), contracts, correspondence, declarations of trusts, deeds, deposit receipts, diagrams, diaries, disks, drafts, films, forms, instruments of conveyance or for other purposes, invoices, journals, ledgers, letters, lists, logs, mailgrams, maps, memoirs, memoranda, minutes, motion pictures, notations, notebooks, notes, notices, photographs, plans, pleadings, other writings filed with any court, powers of attorney, promissory notes, proofs of delivery, purchase orders, recordings, records, registers, schedules, sound recordings, summaries, telexes, working papers, writings, Item (as defined herein) and all other material, whether in draft form or not, and whether a copy or an original.  The term "Document" shall further mean any letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, or other form of data compilation, and shall mean the original of any document as defined above, if available, or to a clear and legible copy thereof, if not available, as well as to any copies or drafts that have any notations of any sort, whether typed, printed, handwritten, or otherwise inscribed, which notations are not present on the original.

4.        "ESI" means electronically stored information, including, but not limited to e-mails, voice-mails, instant messages, text messages, documents, spreadsheets, databases, file fragments, metadata, digital images, and digital diagrams or any other electronically stored information which can be stored in any type of electronic media including, but not limited to, hard drives, thumb drives, computers, handheld devices, backup tapes, and optical disks.  All ESI produced is requested to be produced in **native format**.

5.      "Austral" means Austral Cia. Ltda.

6.      "Relevant Period" refers to the period of time between January 1, 2014 to August 30, 2019.  Unless otherwise stated, all Requests refer only to the Relevant Period.

7.      "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or with an interest in an asset, including gift, grant, alienation, bargain, sale, conveyance, lease, release, pledge creation of lien or encumbrance, assignment, retention of title as a security interest, consignment, bailments of any kind, settlement of any litigation or other, means.

8.      The phrases "reflecting" "regarding" or "relating to" mean, without limitation, constituting, discussing, covering, concerning, comprising, containing, setting forth, showing, disclosing, describing, explaining, summarizing, or referring to, directly or indirectly in any way, the subject matter identified in a particular document request.

9.      "Person(s)" means any natural person, corporate entity, partnership, association or sole proprietorship, including, but not limited to, You.

10.     Whenever appropriate in this request for production of Documents, the singular form of a word shall be interpreted as its plural.

11.     The terms "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this request for production of Documents any information that might otherwise be construed to be outside its scope.

12.     The term "including" means including but not limited to.

## INSTRUCTIONS

1.      A Document is deemed to be within Your possession, custody or control if it is in the possession, custody or control (actual or constructive) of You, any entity owned by or in which You have an interest, or any of Your officers, directors, employees, representatives, agents, accountants, relatives, other fiduciaries or any other person or entity acting for or on behalf of You.

2.      If any Document requested herein was formerly in Your possession, custody or control and has been lost or destroyed, or otherwise disposed of, You are requested to submit, in lieu of any such Document, a written statement: (i) describing in detail the nature of the Document and its contents; (ii) identifying the person who prepared or authorized the Document, and if applicable, the person to whom the Document was sent, copied or blind copied; (iii) specifying the date on which the Document was prepared or transmitted; and (iv) specifying, if possible, the date on which the Document was lost or destroyed, and if destroyed, the conditions of and reason for such destruction and the person(s) requesting and/or performing the destruction.

3.       If any document request herein is withheld on the basis of any claim of privilege, You are requested to submit a list identifying each such Document by stating its date, its signatory or signatories, if signed, each person who participated in its preparation, the address or addresses of the person or persons by whom it was received, the present or last known location and custodian of the original of the document (or, if that is unavailable, the most legible copy thereof), and the basis for the witness's claim of privilege with respect thereto.

4.       This request is a continuing one so as to require you to reasonably supplement your responsive production if you gain knowledge that your response was incomplete.  Any document obtained subsequent to production which would have been produced had it been available or if its existence had been known at the time of production shall be produced forthwith.

5.       Where a Document is requested, the request includes Documents in the possession of the party, the party's predecessor in interest, agents, representatives, and, unless privileged, the party's attorney.

6.       To the extent that no single Document exists or is in your possession, custody or control that contains all the information sought in any particular request, you are to provide such other Documents in your possession, custody or control that are sufficient to show, compute, compile, or explain all the information sought in the request or as much information as is available.

7.       The Documents produced pursuant to this request for production of Documents are to be segregated and identified by the number of the request to which the Documents are responsive.

8.       Unless otherwise indicated, the applicable timeframe to the requests shall be from April 1, 2012, to the date of Your response to this Subpoena.

## **DOCUMENTS REQUESTED**

1.      During the Relevant Period, all Communications between and among You and Austral relating to Motransa S.A., Austral, International brand trucks, the Ecuadorian truck territory and the Ecuadorian truck market.

2.      During the Relevant Period, all Communications, between and among Your officers, directors, employees and/or agents relating to Motransa S.A., Austral, International brand trucks, the Ecuadorian truck territory and the Ecuadorian truck market.

3.      All contracts, agreements, memorandum of understanding, whether in draft or final form, relating to Motransa S.A., Austral, and the Ecuadorian truck territory and truck market, during the Relevant Period.

4.      All Documents exchanged with Austral and/or any third party regarding Motransa S.A., Austral, the Ecuadorian truck territory or truck market during the Relevant Period.

5.      All Transfers, payments, promises of payment, or any other form of consideration, made to You or for Your benefit by Austral or on behalf of Austral during the Relevant Period.

*EXHIBIT "C"*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

In re Application of

MOTRANSA S.A.,

                  Applicant

pursuant to 28 U.S.C. § 1782
For Judicial Assistance in Obtaining
Evidence for Use in Foreign and International
Proceedings.

**ORDER GRANTING APPLICATION FOR**
**JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C §1782**

THIS CAUSE came before the Court upon the Application (the "Application") for Judicial Assistance Pursuant to 28 U.S.C. § 1782 filed by the Motransa S.A. ("Applicant"). The Court has considered the Application and incorporated Memorandum of Law, the Declaration of Eduardo Carmigniani in support of the Application, and supporting materials.  Accordingly, the Court finds that:

A.      Applicant has met the requirements set forth by 28 U.S.C. § 1782 to obtain the requested judicial assistance sought in the Application.

B.      Applicant seeks documentary and testimonial evidence from Navistar, Inc. (the "Discovery Target") for use in a contemplated civil action before the Judicial Unit of Commercial Disputes of Quito (Unidad Judicial Civil de Quito) (the "Ecuadorian Court") to be brought by Applicant against Austral Cia. Ltda. ("Austral") under Ecuadorian law (the "Contemplated Proceeding").

1

C.      The Discovery Target, which regularly transacts business from its office located at 8600 NW 36th Street, Suite 304, Miami, FL 33166, resides or is found in this District.

D.      As a putative claimant or plaintiff in the Contemplated Proceeding before the Ecuadorian Court, Applicant is an interested person within the meaning of 28 U.S.C. § 1782.

E.      Applicant intends to use the information obtained by way of this Application at the outset of the Contemplated Proceeding to satisfy Ecuadorean procedural requirements.

F.      The discretionary factors, as described by the United States Supreme Court in Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 247 (2004), weigh in favor of granting the requested assistance.

G.      More particularly: (1) as the Discovery Target is not expected to be a party to the Contemplated Proceeding before the Ecuadorian Court and is otherwise outside the jurisdiction of the Ecuadorean Court, the need for this discovery is more apparent; (2) there is no indication that the Ecuadorian Court would not be receptive to U.S. federal-court judicial assistance as requested in the Application; (3) the Application does not conceal an attempt to circumvent Ecuadorian proof-gathering restrictions; and (4) the Application seeks discovery that is not unduly intrusive or burdensome as the Application requests evidence of the Discovery Target that is of the type normally kept and produced by businesses during litigation.

Accordingly, it is hereby **ORDERED** and **ADJUDGED** as follows:

1.      The Application is **GRANTED**.

2.      Any discovery taken pursuant to this Order, and any related motion practice, shall be governed by the Federal Rules of Civil Procedure.

3.      Applicant is authorized to issue and serve a subpoena on the Discovery Target in substantially similar form to the form attached to the Application. Applicant is further authorized

to serve additional follow-up subpoenas on the Discovery Target or any person, corporate entity, or financial institution found or residing in this District as may be necessary to obtain the testimonial or documentary evidence described in the Application.

4.     The Discovery Target is ordered to preserve all relevant and potentially relevant evidence in its possession, custody or control until further order of this Court.

5.     Nothing in this Order shall be construed to prevent Applicant from seeking modification of this Order.


IT IS SO ORDERED, this _____ day of _____, 2019.



_____
UNITED STATES DISTRICT COURT JUDGE